IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ZIA SHADOWS, LLC, a New Mexico
Limited Liability Company, ALEX
GARTH, and WILLIAM GARTH

      Plaintiffs,

vs.                                                                                   No. 09-CV-0909 MV/WPL

CITY OF LAS CRUCES, NEW MEXICO,
a municipal corporation; and WILLIAM
MATTICE, in his official and individual
capacities, jointly and severally

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment [Doc. 44]. The Court, having considered Defendants' Motion and corresponding Memorandum in Support [Docs. 45 & 46], Plaintiff's Memorandum in Opposition [Doc. 52], Defendants' Response in Support [Doc. 53], the relevant law, and being otherwise fully informed, finds that Defendants' Motion will be **GRANTED in part** and **DENIED in part** for the reasons stated herein.

## BACKGROUND

Plaintiff Zia Shadows is a New Mexico limited liability company. Alex and William Garth are individuals who serve as principal members of Zia Shadows. In 1998, Plaintiffs purchased property located at 4250 North Elks Drive in Las Cruces with the intent of building a manufactured home community to be called Zia Shadows, from which Plaintiffs would rent spaces for mobile homes. Between 1998 and 2002, Plaintiffs obtained the necessary permits and approvals from Defendant the City of Las Cruces ("the City") and built Phase I of the community. Plaintiffs planned to begin Phase II of the building in 2002, but the cost of

financing manufactured home sales increased.  Plaintiffs first created additional lots to sell in fee simple, with the goal of providing more affordable housing, and subsequently decided to convert the site to a condominium.  Between 2002 and 2006, they submitted numerous proposals to the City for the development of the property.

Eventually, after many revised proposals and City Council meetings at which a final vote on the approval of Plaintiffs' proposed development was tabled, the City approved Plaintiffs' proposal for a Planned Unit Development ("PUD") notwithstanding its concerns regarding Plaintiffs' financial stability.  Thereafter, Plaintiff Alex Garth filed for personal bankruptcy, and ultimately Plaintiffs were forced to relinquish ownership of the property.  Plaintiffs filed the instant lawsuit pursuant to 42 U.S.C. § 1983, arguing that Defendants acted arbitrarily and capriciously in delaying the approval of Plaintiffs' development plan, resulting in a violation of Plaintiffs' constitutional rights to equal protection, due process, and free speech.  Defendants now move for summary judgment on all of Plaintiffs' claims.

## PRELIMINARY PROCEDURAL ISSUES

Defendants assert a number of legal theories in their Motion for Summary Judgment. Primarily, Defendants argue that the case presents no genuine issues of material fact and they are entitled to judgment as a matter of law.  Doc. 45 at 1-2.  In the alternative, Defendants argue that Defendant William Mattiace is entitled to absolute legislative immunity or qualified immunity for his actions.  *Id*. at 2.  However, in their Memorandum in Opposition to Defendants' Motion, Plaintiffs agree to dismiss Defendant Mattiace and move forward with their suit only against the City.  Doc. 52 at 9-10.  Therefore, this Court need no longer consider the defenses of qualified immunity and legislative immunity, which do not pertain to the City of Las Cruces.  *See Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (explaining that the qualified immunity doctrine

"protects government *officials* from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" (internal quotations omitted, emphasis added)). Contrary to Defendants' assertion, the City may indeed be held liable for its own violations of § 1983, as Plaintiffs have not "sued [the City] only because [it was] thought legally responsible for the actions of its officers." *See Hinton v. City of Elwood*, 997 F.3d 774, 782 (10th Cir. 1993). The Court will accordingly proceed to evaluate Plaintiffs' claims against the City.

      Plaintiffs argue that the Court should construe Defendants' Motion as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), as the Court's scheduling order provided that the parties would brief issues relating to qualified immunity before any other defenses, and Plaintiffs accordingly did not conduct complete discovery. *See* Doc. 32. While the Court acknowledges that discovery was phased such that discovery regarding qualified immunity would be conducted first and that any remaining discovery would not take place until after a ruling on qualified immunity, the Federal Rules of Civil Procedure allow a motion for summary judgment to be made at any time prior to 30 days after the close of discovery. FED. R. CIV. P. 56(b). If Plaintiffs believed they needed additional discovery in order to oppose Defendants' Motion, their remedy was to submit an affidavit or declaration specifying the reasons they could not present facts essential to their opposition. FED. R. CIV. P. 56(d). As Plaintiffs have not done this or otherwise shown that additional discovery was needed as to facts essential to this Court's resolution of the pending Motion, the Court will consider Defendants' Motion under Rule 56.

      Finally, although Plaintiffs have voluntarily dismissed Mr. Mattiace from the suit, the Court will use the term "Defendants" so that the language of this Memorandum Opinion and Order is consistent with the parties' arguments.

**LEGAL STANDARD**

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008). The movant bears the initial burden of demonstrating "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991) (internal quotation marks omitted). Once the movant meets this burden, Rule 56 requires the non-moving party to designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." *Id*. at 256. A mere "scintilla" of evidence will not avoid summary judgment. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 251 (citation omitted). Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the Court must abide by three general principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether the case presents a genuine issue as to material facts requiring a trial. *Anderson*, 477 U.S. at 249. Second, the Court must examine the factual record in the light most favorable to the nonmoving party. *Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir. 1997). Third, the Court must not decide any issues of credibility. *Anderson*, 477 U.S. at 255.

**STATEMENT OF MATERIAL FACTS**

As noted above, Plaintiffs began construction of Zia Shadows in 1998, but various issues arose regarding the financing of the development in 2002. On May 8, 2002, the City's planner, Robert Kyle, wrote to Plaintiffs in response to their request to convert Zia Shadows from a typical lease agreement into a condominium. *See* Doc. 9, Ex. 2. Mr. Kyle stated that in his opinion, the Special Use Permit that Plaintiffs had already obtained for the development did not need to be amended in order for Plaintiffs to convert the property to a condominium. On December 12, 2002, Mr. Kyle and another planner, Lani Ruth, informed Plaintiffs via letter that the City Council had adopted a new zoning code on August 6, 2001 that affected mobile home parks. The new code would require Plaintiffs to obtain approval from the City before replacing existing homes or placing new homes in vacant spaces within the park. Mr. Kyle and Ms. Ruth instructed Plaintiffs to propose a "compliance plan" to bring their property within the new regulations. They informed Plaintiffs that September 19, 2003 was the deadline to obtain the City's approval for their compliance plan.

Plaintiffs then decided that federal policy changes regarding the financing of mobile homes made the plan of a condominium development not feasible. Plaintiffs submitted a proposal for a Planned Unit Development ("PUD"), which included a request for a variance from the City zoning ordinance. On April 22, 2003, following Plaintiffs' submission of their PUD proposal, the Planning and Zoning Commission recommended approval of the plan. On June 11, 2003, Plaintiff Alex Garth attended the public meeting held by the Development Review Commission to discuss Plaintiffs' request for a zoning variance to convert the park into a subdivision. *See* Doc. 9, Ex. 3 (summary minutes of meeting). At the meeting, Ms. Ruth detailed certain "legal issues" with respect to Plaintiffs' proposal; namely, the standards for

5

roads within mobile home parks are lower than standard city roads, and the City did not want responsibility for upgrading roads on the property in the event of the mobile home park's closure in the future. *See id.* at 3. For this reason, City staff were working with Plaintiffs to devise a "maintenance agreement" such that the City would not bear responsibility for maintaining roads within the park. *Id.* The primary issue involved a road maintenance plan for Elks Drive. *Id.*

Representatives of the City expressed various concerns with granting Plaintiffs' variance request, and Mr. Garth expressed apparent frustration with the "stumbling blocks" the City placed in Plaintiffs' way of completing their project. *See id.* at 3-4. Mr. Garth argued that Las Cruces had "a great need" for affordable housing, and that Zia Shadows was able to fulfill this need. *Id.* at 4. The discussion focused on the affordability of the proposed housing and representatives of the City suggested that Mr. Garth seemed unable to commit to providing affordable housing as defined by the federal Department of Housing and Urban Development ("HUD"). The minutes then read: "If applicant can demonstrate he is truly providing HUD defined affordable housing, a waiver might be supported." *Id.* at 5.

On November 8, 2004, Plaintiff Zia Shadows filed for Chapter 11 Bankruptcy. On December 6, 2004, an ordinance to approve Plaintiffs' proposed zoning variance was on the agenda for the Las Cruces City Council meeting. According to Plaintiffs, "the application was tabled pending Plaintiffs' ability to create a [sic] amenable plan regarding a water rights issue between Plaintiffs, the City, and third party Dona Aña Mutual, as well as obtaining a letter of credit for improvements to Elks Drive." Doc. 9 at 21. Plaintiffs then appeared at the City Council meeting on January 3, 2005, to request reconsideration of the decision to table their application. The Council expressed concerns regarding water rights on the property, noting the situation was complex and not amenable to a "quick fix." Doc. 9, Ex. 6 at 2. The Council

expressed further concern about the letter of credit for the Elks Drive improvements, as well as the possibility of Plaintiffs entering bankruptcy, and asked Alex Garth meet with City staff to draft a contract prior to any further Council action.

Sometime following the January 3, 2005 City Council meeting, Plaintiff Alex Garth sent City Manager Terrance Moore an undated letter. Doc. 9, Ex. 7. He described the issues delaying the project as "the Elks Drive expansion" and a "water rights payment issue." *Id*. at 1. Mr. Garth argued that the development of Elks Drive was the City's financial responsibility, and further argued that at the time they purchased the property, Plaintiffs were not afforded legally adequate notice of the claim to water rights that had since become an issue. He also mentioned the bankruptcy filing and detailed the ways in which Plaintiffs had amended their development plan so as to respond to prospective home buyers' difficulty obtaining financing and provide affordable housing to the community of Las Cruces. *See id*. at 2-4. Mr. Garth requested that Mr. Moore reconsider and approve Plaintiffs' amended plan.

On January 11, 2006, Plaintiffs met with representatives of the City and various contractors regarding the projected costs of completing the development of Zia Shadows according to Plaintiffs' proposed plan. At this meeting, Mr. Moore, the City Manager, stated that the City would need a Guaranteed Plan of Payment for Plaintiffs' portion of the Elks Drive improvements in order to "expedite placing the matter before the [City] council for consideration." Doc. 9. Ex. 8 at 1. On February 27, 2006, Ted Scanlon, the engineer for the project, informed Plaintiffs that according to the City Engineering Department, Plaintiffs would be responsible for one-half of the improvements to Elks Drive, in the total amount of $208,840. Doc. 9, unlabeled exhibit between Exs. 8 & 9. The City subsequently agreed to this amount as Plaintiffs' "pro-rata cost responsibility." Doc. 9, Ex. 10 at 1.

On March 8, 2006, Alex Garth proposed a formal agreement with the City regarding the construction and improvement to Elks Drive. Doc. 9, Ex. 9. The proposed agreement contains a provision noting that "Zia Shadows is, at this time, pursuing a zone change . . . [to] change the zoning from R-1 with a Special Use Permit (SUP) to a Planned Unit Development (PUD)/Subdivision." *Id*. at 1. Robert Garza, Assistant City Manager, responded with a letter to Mr. Garth that the proposed agreement was unduly voluminous. Doc. 9, Ex. 10 at 1. Mr. Garza instead offered for the City to draft a "simple" version of Mr. Garth's proposed terms. *Id*.

The City Council held a meeting on May 22, 2006, which Alex Garth attended. Doc. 9, Ex. 11. Whereas Mr. Garth wanted the City to approve the zone change to a PUD before discussing the financing of the Elks Drive improvements, representatives of the City first wanted to discuss the Elks Drive issue. They expressed concerns about how Plaintiffs would pay for their pro-rata share of $208,840 given their status in bankruptcy proceedings. Mr. Garth informed the Council that he had a $200,000 bond in place to cover the improvements. Terry Farmer, a representative of Olympic Investments, a creditor to whom Plaintiffs owed three million dollars for a mortgage on the property, expressed that Olympic did not object to the zoning change but was concerned about the payments for the Elks Drive improvements. Terry Farmer explained that the Elks Drive improvements would also have to be approved by the bankruptcy court. Various representatives of the City expressed concerns with approving a plan that might be subsequently rejected by the bankruptcy court. Various members of the public stood up in support of Zia Shadows and urged the Council to approve the zone change. Mr. Scanlon stated that Plaintiffs were likely to "have difficulties moving forward with their negotiations with the bankruptcy courts if they don't get the zone change." *Id*. at 5. He urged approval of the zone change and suggested that the City could address the Elks Drive

8

improvements at a later date. The City Council tabled the vote, but ultimately split the zoning issue from that of the Elks Drive improvements and voted on June 5, 2006 to approve the PUD application. At this meeting, a representative of the City stated that Plaintiffs' pro-rata share of the Elks Drive improvements had been "recalculated" and would actually cost approximately $316,000. Doc. 9, Ex. 12 at 2.

On June 19, 2006, the City Council convened and approved a plan to fund the Elks Drive improvements, but explicitly declined to fund improvements to the portion of Elks Drive that fronted Zia Shadows. Accordingly, Plaintiffs were to bear responsibility for the $316,000 figure announced at the previous meeting. In either August or September of 2006, *see* Doc. 52, Ex. 13 (bearing two dates: August 31, 2006 and 9/11/06), the City rejected Plaintiffs' final subdivision plat pending their submission of a Letter of Map Revision ("LOMR") to the Federal Emergency Management Agency ("FEMA"). As further basis for the rejection, the City stated that Plaintiffs had not yet provided a letter of credit. Plaintiffs argue that due to the City's delays in approving the PUD application, they were unable to sell or lease their property, and were consequently unable to obtain the letter of credit; as a result, Plaintiffs were forced to relinquish ownership of the property in their bankruptcy proceedings.

Plaintiffs' remaining complaints involve the City's actions in Alex Garth's personal bankruptcy proceedings. *See* Doc. 9 at 24-25, ¶¶ 41-49. Plaintiffs have submitted no evidence to support their allegations, and Defendants do not offer their own version of these facts. Rather, Defendants state that the actions of which Plaintiffs complain were permissible under the Federal Rules of Bankruptcy Procedure. Doc. 45 at 12. Plaintiffs respond that the City's alleged actions in Alex Garth's personal bankruptcy proceedings do not give rise to a separate claim under § 1983, but instead simply demonstrate that the City retaliated against Plaintiffs for exercising

their First Amendment Rights.

## DISCUSSION

Plaintiffs assert four claims under § 1983: denial of substantive due process, denial of procedural due process, denial of equal protection, and retaliation in violation of the First Amendment.

### I.     Due Process Claims

The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. AMEND. XIV. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision."  *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000).

Both procedural and substantive due process claims under 42 U.S.C. § 1983 require Plaintiffs to establish that Defendants' actions deprived them of a protectible property interest. *Nichols v. Bd. of Cnty. Comm'rs*, 506 F.3d 962, 969 (10th Cir. 2007).  The Supreme Court has offered the following guidance to aid courts in determining whether a plaintiff has a protectible property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.  It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Whereas "the underlying substantive interest is created by an independent source such as state law, federal constitutional

law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (internal quotations omitted).

"In municipal land use regulation cases such as this, the entitlement analysis presents a question of law and focuses on 'whether there is discretion in the defendants to deny a zoning or other application filed by the plaintiffs.'" *Hyde Park Co.*, 226 F.3d at 1210 (quoting *Norton v. Vill. of Corrales*, 103 F.3d 928, 931-32 (10th Cir. 1996)). The Tenth Circuit has further explained that this analysis "centers on the degree of discretion given the decisionmaker" and not on the probability of a favorable outcome to the landowner. *Hyde Park Co.*, 226 F.3d at 1210 (internal quotations omitted). Accordingly, to prevail on their due process claims, Plaintiffs must demonstrate that under state and local law, they had a "legitimate expectation" that their development proposal would be approved and the City had "limited discretion" to disapprove it. *Id*. Plaintiffs cannot meet this burden.

As noted above, in approximately 2003, Plaintiffs decided that federal policy changes regarding the financing of mobile homes made the plan of a condominium development not feasible and thus decided to submit a proposal for a Planned Unit Development. However, the Las Cruces Municipal Code in effect at the time explicitly provided that a "Planned United Development (PUD) is a zoning district change and is not permitted by right in any zoning district." Doc. 46, Ex. G(2) (Las Cruces Municipal Code) at § 38-49D(a). While the Las Cruces Municipal Code did articulate a number of findings required in order for a plan to be approved, satisfaction of these criteria did not require approval. To the contrary, the Code explicitly provided that "[t]he Concept Plan *may* be approved only if it includes the following findings." *Id.* at § 38-49(D)(c)(2) (emphasis added). Further, the requisite findings are themselves

11

extremely subjective and include that the proposed construction and use "will not be detrimental to the health, safety, or welfare of the community or adjacent neighborhood," that there will be adequate sewage and roadway capacity and energy and water supply to serve the PUD, that the PUD "conforms to the intent, goals, objectives, policies, and standards of all City plans and codes," that the uses proposed "are appropriate to the character of the neighborhood and will have a positive aesthetic effect on the neighborhood," and that the proposed uses "will not subject surrounding properties and pedestrians to significant hazardous traffic conditions." *Id*. The extremely general and subjective nature of these required findings, if anything, underscores the substantial discretion City decisionmakers had over approval. Moreover, following the list of specified criteria, the Code explicitly stated that "[f]inal approval may be granted subject to compliance with such conditions required by the Planning and Zoning Commission and/or the City Council"—thus vesting even greater discretion in the decisionmaker. *Id*. Accordingly, the Court finds that Plaintiffs cannot establish that under the applicable Code, Plaintiffs had a "legitimate expectation" that their development proposal would be approved and the City had "limited discretion" to disapprove it. *See Hyde Park Co.*, 226 F.3d at 1210-13.

Plaintiffs cite a number of state court decisions that they contend give rise to a property right; these cases, however, are distinguishable. *Miller v. City of Albuquerque,* 554 P.2d 665 (N.M. 1976), and *Davis v. City of Albuquerque,* 648 P.2d 777 (N.M. 1982), both cited by Plaintiffs, address requirements that must be met where a piecemeal zoning change is made (*i.e.*, one that affects a relatively small number of landowners) that would impose more restrictive zoning requirements on a landowner's property (known as downzoning). In *Miller*, the New Mexico Supreme Court held that where a piecemeal downzoning change is sought, the person seeking to rezone the property "must show that either there was a mistake in the original zoning

12

or that a substantial change has occurred in the character of the neighborhood since the original zoning to such extent that the reclassification or change ought to be made." 554 P.2d at 668. *Davis* reaffirmed *Miller* in the context of downzoning that disproportionately impacted an eight-block area pursuant to a sector plan. 648 P.2d at 778-79. Both *Miller* and *Davis*, however, explicitly recognize that a "landowner has no vested right in a particular zoning classification for his property," but that the showing required by *Miller* is supported both by a presumption that an initial zoning determination is correct and a need for stability in zoning classifications upon which a property owner may rely. *Miller*, 554 P.2d at 668; *see also Davis*, 648 P.2d at 778 (quoting *Miller*). Here, by contrast, Plaintiffs have not alleged downzoning; rather, in the instant lawsuit, it was Plaintiffs who sought a zoning variance.

Likewise, *Albuquerque Commons Partnership v. City Council*, 184 P.3d 411 (N.M. 2008), cited by Plaintiffs, also involved downzoning. The New Mexico Supreme Court in *Albuquerque Commons Partnership* further recognized that a municipality's discretion to deny a site plan that is otherwise in compliance with existing zoning regulations is limited by the requirement that the decision must pass muster under judicial review of administrative actions that are arbitrary and capricious or otherwise contrary to the law. *Id.* at 428. The Court finds that this limitation, as applied in this case, is insufficient to create a constitutionally protected property right. As noted above, the Las Cruces Municipal Code gave the City broad discretion to consider numerous subjective factors in determining whether to approve Plaintiffs' proposed PUD. The fact that in assessing these factors, the City could not act arbitrarily and capriciously under State law is insufficient to establish that Plaintiffs had a "legitimate expectation" that their proposal would be approved and that the City had "limited discretion" to disapprove it. *See Hyde Park Co.*, 226 F.3d at 1210-13 & n.5.

Finally, Plaintiffs cite *Smith v. Bernalillo County*, 110 P.3d 496, 504 (N.M. 2005), for the proposition that landowners "have a right to use their property as they see fit, within the law, unless restricted by regulations that are clear, fair, and apply equally to all" and that "[a]d hoc, standard-less regulation that depends on no more than a zoning official's discretion would seriously erode basic freedoms that inure to every property owner." *Smith*, however, is also readily distinguished as it involved an appeal of a decision to deny a certain use of property (after the County in question had earlier granted the landowner's request) where the zoning law gave the County no discretion to deny the request. Here, by contrast, Plaintiffs were not seeking to use their property in accordance with the then-applicable zoning, but were seeking a zoning variance, which is explicitly subject to the discretion of the City.

Accordingly, as the City had broad discretion in approving Plaintiffs PUD, Plaintiffs cannot establish that they had a "legitimate expectation" that their development proposal would be approved. Defendants are thus entitled to summary judgment as to Plaintiffs procedural and substantive due process claims.

**II.     Equal Protection Claim**

Plaintiffs argue that Defendants singled them out for unfavorable treatment in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution. They advance a "class of one" theory: Defendants treated them differently than other similarly situated individuals in violation of their right to equal protection of the laws.

The Fourteenth Amendment to the Constitution guarantees that states shall not deprive anyone in their jurisdiction of equal protection of the laws. U.S. CONST. AMEND. XIV. In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the Supreme Court recognized that its precedent supports an equal protection theory of "class of one." Because a class-of-one plaintiff

14

is not alleging membership in a suspect class, he must prove that he has been intentionally singled out for disparate treatment from others who are similarly situated, and there was no rational basis for the different treatment. *Id*. at 564.

The Tenth Circuit has described the "paradigmatic class-of-one case" as one in which "a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive." *Jicarilla Apache Nation v. Rio Arriba Cnty.*, 440 F.3d 1202, 1209 (10th Cir. 2006). Courts should apply this theory cautiously, *id*., and the element of different treatment from similarly situated persons is all the more imperative in class-of-one cases. *Jennings v. City of Stillwater*, 383 F.3d 1199, 1213-14 (10th Cir. 2004). In *Jennings*, the Tenth Circuit explained:

> Traditional equal protection law deals with groups unified by the characteristic alleged to be the root of the discrimination . . . . Looking only at one individual, however, there is no way to know whether the difference in treatment was occasioned by legitimate or illegitimate considerations without a comprehensive and largely subjective canvassing of all possible relevant factors. It is therefore imperative for the class-of-one plaintiff to provide a specific and detailed account of the nature of the preferred treatment of the favored class.

*Id*. Class-of-one plaintiffs must provide "compelling evidence of other similarly situated persons who were in fact treated differently." *Bruner v. Baker*, 506 F.3d 1021, 1029 (10th Cir. 2007) (quoting *Jennings*, 383 F.3d at 1215). Otherwise, the class-of-one theory "could transform the federal courts into 'general-purpose second-guessers of the reasonableness of broad areas of state and local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and local autonomy in our federal system.'" *Jicarilla Apache Nation*, 440 F.3d at 1209 (quoting *Jennings*, 383 F.3d at 1211).

Here, Plaintiffs have not set forth "a specific and detailed account of the nature of the

preferred treatment of the favored class." *Jennings*, 383 F.3d at 1214.  Rather, they have vaguely asserted they "do have evidence" that the City approved zoning changes for other developments during the same time period in which it delayed Plaintiffs' approval.  Doc. 52 at 16.  They list examples of four specific PUD applications that the City approved between January 2005 and February 2006, and attach City Council meeting minutes summarizing the approval process for those four developments.  Doc. 52, Exs. A–D.  However, far from demonstrating that these developers were "similarly situated in material respects," *Jicarilla Apache Nation*, 440 F.3d at 1209, the minutes describe the respective unique characteristics of each property and/or the concerns the Council had regarding approval of the projects.  Plaintiffs have failed to advance evidence of their similarity to these other developers.

Plaintiffs argue that they are in a prejudiced position because unlike Defendants, they have not conducted discovery aside from the narrow issue of qualified immunity.  However, Rule 56, which governs motions for summary judgment, allows either party to move for summary judgment "at any time," FED. R. CIV. P. 56(b), and nothing in the Court's December 15, 2009 scheduling order could have been construed as prohibiting Defendants from doing so.  *See* Doc. 32.  Rule 56 also sets forth a procedure by which the nonmoving party may submit an affidavit explaining the specific reasons that it does not have facts to support its opposition to the motion for summary judgment, and the Court may allow time to conduct additional discovery.  FED. R. CIV. P. 56(d).  Plaintiffs failed to submit a Rule 56(d) affidavit and the Court has no basis to find that consideration of Defendants' motion in its entirety is somehow inappropriate or unfair.  As Plaintiffs have not advanced evidence in support of their class-of-one equal protection claim, Defendants are entitled to summary judgment on this claim.

### III. First Amendment Claim

Plaintiffs argue that Defendant unduly delayed Plaintiffs' PUD application at least in part out of retaliation against Plaintiffs for their speech at public City Council meetings. Defendants argue that Plaintiffs' claim fails because "any action related to the PUD application does not affect their ability to exercise their First Amendment right[s.]" Doc. 45 at 11.

In the First Amendment context, a retaliation claim requires proof that: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1213 (10th Cir. 2000). Plaintiffs generally allege that after they engaged in protected conduct – *i.e.* speaking at City Council meetings – the City retaliated against them by: (1) refusing to approve the pending PUD application; (2) making incorrect statements about Plaintiffs' finances; and (3) demanding without legal basis that Plaintiffs pay the entire cost of the Elks Drive improvements.

Plaintiffs have provided sufficient evidence that Alex Garth engaged in constitutionally protected activity when he spoke at City Council meetings. *See New York Times v. Sullivan*, 376 U.S. 254, 272-73 (1964) (injury to reputation of government officials such as city commissioners does not warrant suppression of speech); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 975-76 (9th Cir. 2010) (assuming that First Amendment applies to speech made in city council meetings, discussing extent to which city can regulate speech, and noting that city may not "extinguish all First Amendment rights" at city council meetings). With respect to the second element of Plaintiffs' First Amendment claim, "a person of ordinary firmness" who had invested

17

years of their time and a great deal of resources into the development of a manufactured home community, would certainly be "chilled" from engaging in conduct that would cause them to lose the property. The injury that Plaintiffs contend they suffered – delay of their PUD application, sudden subjection to a substantially greater responsibility for the Elks Drive funding, and ultimately, the loss of their property – would "chill a person of ordinary firmness" from continuing to speak at City Council meetings, if in fact a causal relationship existed between the speech and the injury. Yet to determine whether or not such a causal relationship may have existed, the Court must analyze the third element of Plaintiffs' First Amendment claim: whether or not Plaintiffs can establish that any of the City actors were "substantially motivated" by Plaintiffs' protected speech when the City delayed approval of the PUD application and subjected Plaintiffs to additional financial responsibilities.

     At this juncture, the Court has insufficient evidence to conclude that Plaintiffs' exercise of their First Amendment rights did not motivate Defendants' actions. Although Defendants loosely state that their concerns regarding Plaintiffs' financial stability caused the allegedly retaliatory actions, neither party has advanced direct evidence that would tend to explain the City's various delays of Plaintiffs' application nor its imposition of additional financial responsibility on Plaintiffs. The minutes from the May 22, 2006 City Council meeting demonstrate that various City officials expressed concerns regarding Plaintiffs' ability to finance the Elks Drive improvements and how the bankruptcy proceedings might affect this financing, and such evidence could indeed support a theory that the City was motivated purely by Plaintiffs' finances. However, Defendants have not explained why Plaintiffs' $200,000 bond did not assuage their concerns, nor have they advanced any evidence to explain the sudden "recalculation" of Plaintiffs' share of the improvements to Elks Drive.

The Court notes that like in the employment context, it will often be difficult for a plaintiff asserting a First Amendment retaliation claim to assert evidence of such a claim at the summary judgment stage.  *See Ramirez v. Okla. Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) ("because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence"), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194 (10th Cir. 1998).  Given that Defendants' allegedly retaliatory actions occurred after Mr. Garth's attendance and speech at various City Council meetings and that Defendants failed to submit evidence demonstrating that their motives were decidedly non-retaliatory, Defendants are not entitled to summary judgment on Plaintiffs' First Amendment claim of retaliation.

## CONCLUSION

**IT IS THEREFORE ORDERED** that the claims against Defendant William Mattice are hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that summary judgment is **GRANTED** in favor of the City of Las Cruces as to Plaintiffs' procedural due process, substantive due process, and equal protection claims.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [Doc. 44] is **DENIED** as to Plaintiffs' First Amendment retaliation claims brought against the City of Las Cruces.

Dated: this 31st day of March, 2011

_____
**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**

<u>Attorneys for Plaintiffs</u>:
    Cindy Rhodes Victor, Esq.
    Kevin D. Hammar, Esq.

<u>Attorney for Defendants</u>:
    William L. Lutz, Esq.
    David P. Lutz, Esq.