IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

ZIA SHADOWS, L.L.C., a New
Mexico Limited Liability Company,
ALEX GARTH and WILLIAM
GARTH,

        Plaintiffs,

vs.                                                          No. 09 CV 0909 MV/WPL

CITY OF LAS CRUCES, NEW
MEXICO, a municipal corporation,
and WILLIAM MATTIACE, in his
official and individual capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment (Doc. 98). The Court has considered the motion, briefs, and the relevant law, and being otherwise fully informed, **FINDS** that the motion shall be **GRANTED IN PART AND DENIED IN PART** for the reasons stated herein.

## FACTUAL BACKGROUND

Plaintiff Zia Shadows is a New Mexico limited liability company. Alex Garth and William Garth are individuals who serve as principal members of Zia Shadows. The City of Las Cruces is the only remaining defendant in this action, as Plaintiffs agreed to dismiss Defendant William Mattiace. *See* Doc. 52 at 9-10.

In 1998, Plaintiffs purchased property located at 4250 North Elks Drive in Las Cruces with the intent of building a manufactured home community to be called Zia Shadows, from

1

which Plaintiffs would rent spaces for mobile homes.  Between 1998 and 2002, Plaintiffs

obtained the necessary permits and approvals from Defendant the City of Las Cruces ("the City")

and built Phase I of the community.  Plaintiffs planned to begin Phase II of the building in 2002,

but the cost of financing manufactured home sales increased.  Plaintiffs first created additional

lots to sell in fee simple, with the goal of providing more affordable housing, and subsequently

decided to convert the site to a condominium.  However, due to federal policy changes regarding

the financing of mobile homes, Plaintiffs concluded that their plan for a condominium

development was no longer feasible.  In addition, in December 2002 the City informed Plaintiffs

that it had adopted a new zoning code in 2001, which affected mobile home parks.

Between 2003 and 2006 Plaintiffs submitted numerous proposals to the City for the

development of the property.  In March 2003, Plaintiffs submitted a proposal for a planned unit

development ("PUD"), which is an alternate development tool for projects that propose a

beneficial use of the land that is not possible under its current zoning classification.  Plaintiffs

proposed to convert the existing mobile home park into a mobile home subdivision, which would

contain private roads in a gated setting.  Lani Ruth, a planner for the City, recommended to the

Planning and Zoning Commission that Plaintiffs' proposal be approved.  Ms. Ruth based her

recommendation on various specific findings that Plaintiffs' PUD was consistent with the City's

Comprehensive Plan.  *See* Doc. 102-7 at 4-5.  She placed particular emphasis on the fact that the

proposal stated that it would provide public housing, which was in great demand at the time.

On April 22, 2003, the Planning and Zoning Commission recommended approval of the

PUD proposal.  Plaintiffs appeared before a meeting of the Development Review Committee on

June 11, 2003, where a representative of the City informed Plaintiffs that the City *might* support

a zoning variance if Plaintiffs could "demonstrate [they were] truly providing HUD-defined affordable housing[.]"  Doc. 102-9 at 6.

On November 8, 2004, Plaintiff Zia Shadows filed for Chapter 11 Bankruptcy.  On December 6, 2004, the City Council tabled a vote on Plaintiffs' proposed PUD after a member of the City Council stated that "the developer needs to compensate the city for inequities that are built into this mobile home park."  Doc. 97-4 at 3.[1]  The councilor "asked for an estimate to make this as equal as possible."  *Id.*  On January 3, 2005, Alex Garth asked the City Council to work with Zia Shadows to create a development plan that would assuage the concerns of the City regarding water rights.[2]  In response, councilors expressed concern about Plaintiffs' finances and their ability to fund the project.  Mr. Garth and the City agreed to draft a definitive contract before the City was to address the Elks Drive improvements at another meeting.  The matter was tabled for over a year.

Following the meeting on January 3, 2005, Plaintiffs corresponded and met with various representatives of the City.  During these meetings, Plaintiffs voiced their position that the project was being unnecessarily delayed due to a disagreement about the funding of improvements that were necessary on Elks Drive.  In Plaintiffs' opinion, it was the City's responsibility to ensure that Elks Drive was in adequate condition to sustain the development of Zia Shadows.  City representatives then informed Plaintiffs that they would be responsible for funding one-half of the necessary improvements to Elks Drive, for a total of roughly $208,000.

At a City Council meeting on May 5, 2006, Mr. Garth urged the City to approve the zone change to a PUD before discussing the financing of the Elks Drive improvements, but

---

[1] All factual findings relating to City Council meetings are based on the official minutes of these meetings, which both parties attached as exhibits to their briefing.

[2] The parties have not provided the Court any details regarding this water rights issue aside from the fact that it arose between Plaintiffs, the City, and third party Dona Aña Mutual.  *See* Doc. 9 at 21.

representatives of the City first wanted to discuss the Elks Drive issue.  They expressed concerns about how Plaintiffs would pay for their pro-rata share of the improvements given their status in bankruptcy proceedings.  Mr. Garth informed the Council that he had a $200,000 bond in place to cover the improvements.  Terry Farmer, a representative of Olympic Investments, a creditor to whom Plaintiffs owed three million dollars for a mortgage on the property, expressed that Olympic did not object to the zoning change but was concerned about the payments for the Elks Drive improvements.  Terry Farmer explained that the Elks Drive improvements would also have to be approved by the bankruptcy court.  Various representatives of the City expressed concerns about approving a plan that might be subsequently rejected by the bankruptcy court.  Members of the public stood up in support of Zia Shadows and urged the Council to approve the zone change. Ted Scanlon, the engineer for the project, stated that Plaintiffs were likely to "have difficulties moving forward with their negotiations with the bankruptcy courts if they don't get the zone change."  Doc. 102-18 at 6.  He urged approval of the zone change and suggested that the City could address the Elks Drive improvements at a later date.  The City Council tabled the vote, but ultimately split the zoning issue from that of the Elks Drive improvements and revisited the matter at the next meeting.

At the City Council meeting on June 5, 2006, Vince Banegas, the City's Development Services Manager, informed Plaintiffs that their share of the cost of the Elks Drive improvements had been "recalculated," and they would in fact be responsible for $316,000 worth of improvements.  Doc. 97-6 at 3.  At this meeting, Alex Garth and various investors urged the Council to approve the PUD, as Plaintiffs had secured a bond and investors were confident about proceeding with the plan.  Various councilors still expressed their reservations about moving forward, noting Plaintiffs' status in bankruptcy proceedings.  However, the Council ultimately

4

voted to approve Plaintiffs' PUD, notwithstanding its concerns regarding Plaintiffs' financial stability.

On June 19, 2006, the City Council convened and approved a plan to fund the Elks Drive improvements, but explicitly declined to fund improvements to the portion of Elks Drive that fronted Zia Shadows.  Accordingly, Plaintiffs were to bear responsibility for the $316,000 figure announced at the previous meeting.  Ultimately, the City rejected Plaintiffs' final subdivision plat pending their submission of various paperwork to the City as well as the Federal Emergency Management Agency ("FEMA").  Plaintiffs argue that due to the City's delays in approving the PUD application, they were unable to sell or lease their property, and were consequently forced to relinquish ownership of the property in bankruptcy proceedings.[3]

Plaintiffs have submitted evidence that, in contrast to Zia Shadows, other mobile and manufactured home parks in Las Cruces were not required to submit PUDs in order to comply with the City's zoning code.  The City has not provided examples of other mobile and manufactured home parks who were required to show that they were providing affordable housing.  In addition, Plaintiffs claim that the City has not required the property's current proprietor to comply with the requirements it imposed when Plaintiffs still owned the property.

Plaintiffs have filed the instant lawsuit pursuant to 42 U.S.C. § 1983, arguing that Defendants acted arbitrarily and capriciously in delaying the approval of Plaintiffs' development plan, in denial of Plaintiffs' constitutional rights to due process, equal protection, and free speech.  The City now moves for summary judgment on all of Plaintiffs' claims.

## LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

---

[3] Alex Garth filed for personal bankruptcy on June 16, 2008.

and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2).  The

moving party bears the initial burden of showing "an absence of evidence to support the

nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.

1991) (internal quotation and marks omitted).  The burden then shifts to the non-moving party to

show a genuine issue of material fact.  *Id.*  In response to a properly supported motion for

summary judgment, the non-movant "may not rely merely on allegations or denials in its own

pleading . . . [but rather must] set out specific facts showing a genuine issue for trial."  *Id.*

     In reviewing a motion for summary judgment, it is not the Court's role to weigh the

evidence, assess the credibility of witnesses, or make factual findings.  *Utah Lighthouse Ministry*

*v. Found. for Apologetic Info. & Research*, 527 F. 3d 1045, 1050 (10th Cir. 2008).  Rather, the

Court's task is to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 243 (1986).  Where a rational trier of fact, considering the record as a

whole, could not find for the non-moving party, there is no genuine issue for trial.  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

## I.    Municipal Liability as a Preliminary Issue

     As a threshold matter, the City argues that the Court should dismiss this action now that

the parties have stipulated to the dismissal of Defendant William Mattiace.  It argues that a

governmental entity such as the City of Las Cruces "may not be held liable for constitutional

violations where there is no underlying constitutional violation by any of its officers."  Doc. 97 at

6 (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).  It then contends that "a

finding that no individual officers violated the law preludes the imposition of municipal

liability."  *Id.*  (citing *Sevier v. City of Lawrence*, 853 F. Supp. 1360, 1369 (D. Kan. 1994)).

6

The City's reliance on these principles is misplaced.  The Supreme Court and all federal circuits have long recognized that when a theory of municipal liability hinges solely on the municipality's responsibility for the conduct of its officers or employees, a finding that the officers or employees committed no violation necessarily compels a conclusion of no municipal liability.  *See*, *e.g.*, *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (when plaintiff sued city solely on theory that it was legally responsible for police officer's constitutional violation, conclusion that officer committed no violation precluded imposition of liability against city).   In addition, "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Svcs. of New York*, 436 U.S. 658, 691 (1978) (emphasis in original). However, a municipality can, in fact, be held liable for *its own* unconstitutional act.  *Jantzen v. Hawkins*, 188 F.3d 1247, 1259 (10th Cir. 1999).  In a case against the City of Denver, Colorado, the Tenth Circuit explicitly held that "the City may be liable on the basis of its own conduct even if no City employee is found to have committed a constitutional violation in his individual capacity." *Williams v. City and County of Denver*, 99 F.3d 1009, 1019 (10th Cir. 1996) (*vacated on other grounds*, 140 F.3d 855 (10th Cir.1997)).  More recently, the Supreme Court reaffirmed the principle that "[a] municipality or other local government may be liable under [§ 1983] if the governmental body itself subjects a person to a deprivation of rights[.]"  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011) (citation and quotation marks omitted).  The City's assertions run directly contrary to this wealth of authority, and they are without merit.

## II.    Due Process Claims

Plaintiffs argue that the City's denial of their application for a zoning variance amounted to a violation of their substantive and procedural due process rights.  They argue that their

application should not have been presented to the City Council under the provisions of the zoning code, but should have been granted in March, 2003 when the Community Development Department slated it for approval.  This expectation of approval, along with Plaintiffs' possession of a Special Use Permit – which they allege the City took away from them without explanation – amounted to a protectible property interest.  The City responds that Plaintiffs had no protectible property interest due to the City's vast discretion in approving or denying variance applications.  Accordingly, contends the City, it committed no due process violation.

The Fourteenth Amendment's Due Process Clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1210 (10th Cir. 2000). Both procedural and substantive due process claims under 42 U.S.C. § 1983 require Plaintiffs to establish that Defendants' actions deprived them of a protectible property interest.  *Nichols v. Bd. of County Comm'rs of La Plata, Colo.*, 506 F.3d 962, 969 (10th Cir. 2007).  The Supreme Court has offered the following guidance to aid courts in determining whether a plaintiff has a protectible property interest:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.  It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined.  It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  Whereas "the underlying

substantive interest is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (internal quotations omitted).

### A.    Denial of PUD

In municipal land use regulation cases, "the entitlement analysis presents a question of law and focuses on 'whether there is discretion in the defendants to deny a zoning or other application filed by the plaintiffs.'" *Hyde Park Co.*, 226 F.3d at 1210 (quoting *Norton v. Vill. of Corrales*, 103 F.3d 928, 931-32 (10th Cir. 1996)). The Tenth Circuit has further explained that this analysis "centers on the degree of discretion given the decisionmaker" and not on the probability of a favorable outcome to the landowner. *Id.* (internal quotations omitted). "A property interest exists if discretion is limited by the procedures in question, that is, whether the procedures, if followed, require a particular outcome." *Jordan-Arapahoe, LLP v. Bd. of County Com'rs of County of Arapahoe, Colo.*, 633 F.3d 1022, 1026 (10th Cir. 2011) (quotation omitted). Accordingly, to prevail on their due process claims, Plaintiffs must demonstrate that under state and local law, they had a "legitimate expectation" that their development proposal would be approved and the City had "limited discretion" to disapprove it. *Id.*

Plaintiffs provide a detailed factual account of their efforts to obtain their requested zoning classification. They point to a number of actions on the part of the City that they argue were arbitrary, capricious, or otherwise without merit. While the Court is indeed puzzled by the confused and protracted process in which the City engaged with respect to Plaintiffs' application, the City's actions are not relevant unless Plaintiff can first prevail on the legal question of whether it had a constitutionally protected property interest. *See Jordan-Arapahoe*, 633 F.3d at

1025 ("to state a claim for the deprivation of property without due process, [Plaintiff] must allege facts plausibly suggesting (1) [Defendant] deprived it of a protected property interest, and (2) such deprivation was arbitrary.").

As noted above, in approximately 2003, Plaintiffs decided that federal policy changes regarding the financing of mobile homes made the plan of a condominium development not feasible and thus decided to submit a proposal for a Planned Unit Development.  However, the Las Cruces Municipal Code in effect at the time explicitly provided that a "Planned Unit Development (PUD) is a zoning district change and is not permitted by right in any zoning district."  Doc. 46, Ex. G(2) (Las Cruces Municipal Code) at § 38-49D(a).  While the Las Cruces Municipal Code did articulate a number of findings required in order for a plan to be approved, satisfaction of these criteria did not require approval.  To the contrary, the code explicitly provided that "[t]he Concept Plan *may* be approved only if it includes the following findings." *Id*. at § 38-49(D)(c)(2) (emphasis added).  Further, the requisite findings are themselves extremely subjective and include that the proposed construction and use "will not be detrimental to the health, safety, or welfare of the community or adjacent neighborhood," that the PUD "conforms to the intent, goals, objectives, policies, and standards of all City plans and codes," that the uses proposed "are appropriate to the character of the neighborhood and will have a positive aesthetic effect on the neighborhood," and that the proposed uses "will not subject surrounding properties and pedestrians to significant hazardous traffic conditions." *Id*.  The extremely general and subjective nature of these required findings, if anything, underscores the substantial discretion City decisionmakers had over approval.  Moreover, following the list of specified criteria, the code explicitly stated that "[f]inal approval may be granted subject to compliance with such conditions required by the Planning and Zoning Commission and/or the

City Council" – thus vesting even greater discretion in the decisionmaker.  *Id.*

Plaintiffs cite a different provision of the zoning code to support their argument that they had a legitimate claim of entitlement to a PUD.  That provision sets forth the procedures for creating a compliance plan in light of new amendments to the zoning code.  *See* Doc. 102 at 12 (quoting Las Cruces Municipal Code § 38-73(B)(3)(c)).  Although this cited section indicates that the final approval for a compliance plan rests in the hands of the Community Development Department, nowhere does it suggest that the subjective criteria outlined above would not govern the plan's approval, nor that the Department otherwise has limited discretion to approve such a plan.  Accordingly, Plaintiffs cannot establish that under the applicable code, they had a "legitimate expectation" that their development proposal would be approved and the City had "limited discretion" to disapprove it.  *See Hyde Park Co.*, 226 F.3d at 1210-13.  The Court will grant summary judgment with respect to Plaintiff's due process claims insofar as they concern the City's denial of Plaintiffs' request for a PUD.

**B.    Special Use Permit**

Plaintiffs obtained a Special Use Permit (SUP) in February, 1996 under the City's zoning code for the construction of a mobile home park on the property.  The City granted Plaintiffs the SUP pursuant to the zoning code at the time, which allowed Plaintiffs to begin construction of Zia Shadows even though they were not in complete compliance with the provisions of the code applicable to mobile home parks.  Plaintiffs allege that the City violated their due process rights by arbitrarily taking away their SUP.  Plaintiffs provide deposition testimony from Robert Kyle, a city planner, who stated that Plaintiffs had a SUP on the property, allowing Zia Shadows to remain a legal mobile home park even though it was not entirely compliant with the zoning code.  Doc. 102-14 at 3 (Kyle deposition at 15).

In 2001, the City amended its zoning code.  City planners Robert Kyle and Lani Ruth sent a letter to Plaintiffs on December 12, 2002 informing them of the changes and explaining the process by which they could bring their existing mobile home park into compliance with the new code.  The letter states, "An approved special use permit or planned unit development *may* satisfy the compliance plan requirement."  Doc. 102-2 at 1 (emphasis added).  It warns that the new regulations may require significant upgrade, whereas in some cases, required changes may be minor.  Mobile home park owners were given one year to submit a compliance plan, and if they did not submit a plan within this time frame, their park would have to cease operation within five years.  Nowhere does the letter provide any basis for Plaintiffs to believe that they were certain to retain their SUP.

Plaintiffs do not provide any authority to support their assertion that the City's "taking away" their SUP amounted to a due process violation.  Although they are correct that they had a SUP which allowed them to be out of compliance with the zoning code, to have a "legitimate claim of entitlement" to this SUP, they would have to have a legitimate expectation that the City would not amend its zoning code.  Plaintiffs provide no authority that would support a finding that such an expectation would be legitimate.  It is entirely reasonable for municipalities to amend their regulations, and the letter the city planners sent to Plaintiffs sets forth a reasonable process for those in possession of SUPs or PUDs to bring their properties into compliance.  They were allowed one year to submit a compliance plan, and an additional seven years to implement the plan once it was approved by the City.  Doc. 102-2.  Plaintiffs have thus failed to show that they had a legitimate claim of entitlement to their SUP, and Defendants are entitled to summary judgment as to Plaintiffs' due process claims with respect to the SUP.

III.     **Equal Protection Claim**

Plaintiffs argue that the City singled them out for unfavorable treatment in violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution.  They advance a "class of one" theory: the City treated them differently than other similarly situated individuals in violation of their right to equal protection of the laws.

The Fourteenth Amendment to the Constitution guarantees that states shall not deprive those in their jurisdiction of equal protection of the laws. U.S. Const. amend. XIV.  In *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), the Supreme Court recognized that its precedent supports an equal protection theory of "class of one."  Because a class-of-one plaintiff is not alleging membership in a suspect class, he must prove that he has been intentionally singled out for disparate treatment from others who are similarly situated, and there was no rational basis for the different treatment.  *Id*. at 564.  Accordingly, in the class-of-one context, official action does not violate the Equal Protection Clause so long as it is "rationally related to a legitimate government purpose."  *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006).  One such established legitimate purpose is a municipality's "promotion of public health, safety, and general welfare of [its citizens] via the control of traffic, noise, and pollution."  *Id*.

The Tenth Circuit has described the "paradigmatic class-of-one case" as one in which "a public official inflicts a cost or burden on one person without imposing it on those who are similarly situated in material respects, and does so without any conceivable basis other than a wholly illegitimate motive."  *Jicarilla Apache Nation v. Rio Arriba County*, 440 F.3d 1202, 1209 (10th Cir. 2006).  Courts should apply this theory cautiously, *id*., and the element of different

treatment from similarly situated persons is all the more imperative in class-of-one cases.

*Jennings v. City of Stillwater*, 383 F.3d 1199, 1213-14 (10th Cir. 2004).  In *Jennings*, the Tenth

Circuit explained:

> Traditional equal protection law deals with groups unified by the characteristic
> alleged to be the root of the discrimination . . . .  Looking only at one individual,
> however, there is no way to know whether the difference in treatment was
> occasioned by legitimate or illegitimate considerations without a comprehensive
> and largely subjective canvassing of all possible relevant factors.  It is therefore
> imperative for the class-of-one plaintiff to provide a specific and detailed account
> of the nature of the preferred treatment of the favored class.

*Id.*  These concerns are ever present in the context of municipal zoning, where a governmental

body "will often, perhaps almost always, treat one landowner differently from another, and one

might claim that, when a city's zoning authority takes an action that fails to conform to a city

zoning regulation, it lacks a 'rational basis' for its action[.]"  *Olech*, 528 U.S. at 565 (Breyer, J.,

concurring in the judgment).

Due to these considerations, class-of-one plaintiffs must provide "compelling evidence of

other similarly situated persons who were in fact treated differently."  *Bruner v. Baker*, 506 F.3d

1021, 1029 (10th Cir. 2007) (quoting *Jennings*, 383 F.3d at 1215).  This evidence must be

sufficient to allow the Court to "meaningfully compare" the City's treatment of all parties.

*Jennings*, 383 F.3d at 1215.  Otherwise, the class-of-one theory "could transform the federal

courts into 'general-purpose second-guessers of the reasonableness of broad areas of state and

local decisionmaking: a role that is both ill-suited to the federal courts and offensive to state and

local autonomy in our federal system.'"  *Jicarilla Apache Nation*, 440 F.3d at 1209 (quoting

*Jennings*, 383 F.3d at 1211).

The factual background in *Jennings* provides a helpful starting point for the Court's

class-of-one analysis.  There, the plaintiff alleged that police officers in Stillwater, Oklahoma

failed to adequately investigate an alleged rape. *Jennings*, 383 F.3d at 1200. She presented evidence that out of fifty individuals who reported rapes to the police, she was the only one who was forced to sign a waiver of prosecution. *Id*. at 1209. The Tenth Circuit nonetheless held that this did not constitute "compelling evidence" of different treatment, noting that the plaintiff failed to "supply *any* information regarding the allegedly similarly situated rape victims." *Id*. at 1215. Although the following examples are specific to the facts at issue in *Jennings*, it is helpful to review what evidence the Tenth Circuit would have needed in order to evaluate the plaintiff's class-of-one claim: "What were the relative strengths of [the other fifty] cases? In how many was the victim's consent a central issue? Did other victims admit to being drunk? Did the rapes occur in a party setting? Did any other victim state that she would have trouble identifying the perpetrators?" *Id*.

Plaintiffs contend that they have provided adequate evidence of other similarly situated mobile home parks and subdivisions that were treated more favorably than Plaintiffs. They claim that of the "several" mobile home parks in the City, Doc. 102, Zia Shadows was the only one that the City required to comply with the zoning code. Additionally, aside from Plaintiffs, no mobile home park applicant was required to submit financial information to the City. Furthermore, the City has not required the current proprietor of the subject property to comply with any of the requirements it imposed on Plaintiffs. The City required Plaintiffs to pay for substantially more than their share of the Elks Drive improvements, with no legal basis to support such a demand, and made no such similar demands of other similarly situated mobile home park landowners.

The evidence Plaintiffs have submitted is insufficient to meet the requirement of "compelling evidence" articulated in *Bruner* and *Jennings*. They present deposition testimony

from Vince Banegas, Development Services Manager.  During Mr. Banegas's deposition, Plaintiffs' counsel asked him if various mobile home parks in Las Cruces were in compliance with the new zoning code, and/or whether such parks were in the compliance plan process set forth in the December, 2002 letter from city planners Robert Kyle and Lani Ruth.  *See* Doc. 102-2 at 1.  As Mr. Banegas did not have files pertaining to these parks with him at his deposition, he was unable to remember whether most of them had compliance plans.  *See* Doc. 102-4 at 3-4 (Banegas deposition at 49-53).  Nor could he remember if any other mobile home parks were required to prove they were providing affordable housing in order to obtain a zoning variance; however, he referenced one park on the East Mesa he believed might have been subjected to such a requirement in light of the emphasis on affordable housing in the City's comprehensive plan, but he could not remember the property's name.  *Id*. at 8 (Banegas deposition at 86-87).

With respect to Plaintiffs' claim that Zia Shadows was the only mobile home park the City required to submit financial information, Plaintiffs have provided insufficient evidence. They cite to a page of Robert Kyle's deposition that they do not provide.  As such, the record before the Court contains no evidence to support this claim.

The Court would also note that much of the evidence to which Plaintiffs cite actually supports a finding that other mobile home parks were not similarly situated to Zia Shadows, insofar as the class-of-one equal protection analysis is concerned.  Mr. Banegas stated that the City began contacting individual mobile home parks in 2001 after the changes to the zoning code were implemented.  Representatives from the City met with each mobile home park owner individually about implementing a compliance plan.  It is evident from his testimony that each park was uniquely situated, and different considerations applied depending on the extent of the changes each park had to implement in order to come into compliance with the new code.  *See*

*id*. at 3 (Banegas deposition at 49) ("We began . . . initiating meetings to go over how to bring about compliance, a very painful process, very lengthy process.  And there's still some mobile-home parks that are not in compliance, and mobile-home parks that we have not completed compliance plans for.").  This is corroborated by the City Council meeting minutes that Plaintiffs attached to earlier briefing, which summarize the approval process for four other developments in Las Cruces.  *See* Doc. 52, Exs. A-D.  Far from demonstrating that these developers were "similarly situated in material respects," *Jicarilla Apache Nation*, 440 F.3d at 1209, the minutes describe the respective unique characteristics of each property and/or the unique concerns the Council had regarding approval of the projects.  Plaintiffs allege that various actions on the City's part amounted to arbitrary and capricious treatment, but the Court has no evidence of similarly situated mobile home park owners who were treated materially differently.

It is clear from the Court's analysis in *Jennings*, *see supra* at 14-15 (quoting *Jennings*, 383 F.3d at 1215), that Plaintiffs must submit detailed evidence demonstrating the extent to which other mobile home parks who received more favorable treatment were indeed similarly situated.  Plaintiffs have failed to make such a showing.  They have loosely referenced other parks, but have not provided any information regarding the size of those parks, the financial situation of those parks' owners, the manner in which they were contributing to the public welfare, or the extent to which they were or were not in compliance with the new zoning code.  Without this information, the Court cannot find that the City violated Plaintiffs' equal protection rights.

## IV.     First Amendment Claim

In the First Amendment context, a retaliation claim requires proof that: (1) the plaintiff

was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.  *Worrell v. Henry*, 219 F.3d 1197, 1213 (10th Cir. 2000).

Plaintiffs generally allege that after they engaged in protected conduct – *i.e.* speaking at City Council meetings – the City retaliated against them by: (1) refusing to approve the pending PUD application; (2) making incorrect statements about Plaintiffs' finances; and (3) demanding without legal basis that Plaintiffs pay the entire cost of the Elks Drive improvements.  The City argues that its actions in relation to Plaintiffs' PUD application did not affect their ability to speak at City Council meetings.  The City further argues that Plaintiffs have failed to submit any evidence of retaliation, specifically highlighting the affidavit of Plaintiffs' own engineer, Ted Scanlon, who states that he saw no evidence of retaliation.

The City does not dispute that Alex Garth engaged in constitutionally protected activity when he spoke at City Council meetings. *See New York Times v. Sullivan*, 376 U.S. 254, 272-73 (1964) (injury to reputation of government officials such as city commissioners does not warrant suppression of speech); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 975-76 (9th Cir. 2010) (assuming that First Amendment applies to speech made in city council meetings, discussing extent to which city can regulate speech, and noting that city may not "extinguish all First Amendment rights" at city council meetings).  With respect to the second element of Plaintiffs' First Amendment claim, "a person of ordinary firmness" who had invested years of their time and a great deal of resources into the development of a manufactured home community, would certainly be "chilled" from engaging in conduct that would cause them to

lose the property.  The injury that Plaintiffs contend they suffered – delay of their PUD application, sudden subjection to a substantially greater responsibility for the Elks Drive funding, and ultimately, the loss of their property – would "chill a person of ordinary firmness" from continuing to speak at City Council meetings, if in fact a causal relationship existed between the speech and the injury.

The issue, then, is whether or not the City's actions in delaying the PUD and substantially raising the cost to Plaintiffs of the Elks Drive improvements without explanation were "substantially motivated" by Alex Garth's speech at City Council meetings.  It will often be difficult for a plaintiff asserting a First Amendment retaliation claim to assert evidence of such a claim at the summary judgment stage.  *See Ramirez v. Okla. Dept. of Mental Health*, 41 F.3d 584, 596 (10th Cir. 1994) (in employment context, "because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence"), *overruled on other grounds by Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1194 (10th Cir. 1998).  "[C]aution should be exercised in granting summary judgment where state of mind is in issue."  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983); *see also Ballinger v. North Carolina Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) ("summary judgment is seldom appropriate in cases wherein particular states of mind are decisive"); *cf. Setliff v. Memorial Hosp. of Sheridan County*, 850 F.2d 1384, 1393-94 (10th Cir. 1988) (in First Amendment retaliation context, summary judgment appropriate where plaintiff failed to present any evidence or specific facts rebutting defendant's affidavit denying retaliation).

At this juncture, the Court has insufficient evidence to conclude that Plaintiffs' exercise of their First Amendment rights did not motivate Defendants' actions.  Although Defendants loosely state that their concerns regarding Plaintiffs' financial stability caused the allegedly

retaliatory actions, neither party has advanced adequate evidence that would tend to explain the delays in approving Plaintiffs' application, nor the sudden imposition of additional financial responsibility on Plaintiffs.  While it is indeed the plaintiff who bears the burden of proving retaliation, at the summary judgment stage the Court must "examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party."  *Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009). Particularly given the complexities of proving retaliation at this stage of the proceedings, the Court finds that the record contains genuine issues of fact that would be more appropriately resolved at trial.

The minutes from the May 22, 2006 City Council meeting demonstrate that various City officials expressed concerns regarding Plaintiffs' ability to finance the Elks Drive improvements and how the bankruptcy proceedings might affect this financing, and such evidence could indeed support a theory that the City was motivated purely by Plaintiffs' finances.  However, Defendants have not explained why Plaintiffs' $200,000 bond did not assuage their concerns, nor have they advanced any evidence to explain the sudden "recalculation" of Plaintiffs' share of the improvements to Elks Drive.  Ted Scanlon's affidavit suggests that it was common practice to require developers to shoulder these costs, but his affidavit is contradicted by that of Steven McCollum, who states that Mr. Scanlon admitted that he did not base his affidavit on personal knowledge.  Doc. 102-31.  Regardless, Mr. Scanlon was an engineer Plaintiffs hired to work on their project; he did not act as a representative of the City, nor did he experience any alleged retaliation on the City's part.  His opinion that the City did not act in a retaliatory fashion bears little, if any, relevance to the ultimate question. The affidavits of Mr. Scanlon and Mr. McCollum, as well as the City's failure to explain its "recalculation" of Plaintiffs' share of the

Elks Drive improvements, create material factual disputes that render summary judgment inappropriate.

## CONCLUSION

It is **HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 98) is **GRANTED** with respect to Plaintiffs' procedural due process, substantive due process, and equal protection claims.  Defendants' Motion is **DENIED** as to Plaintiffs' First Amendment retaliation claims.

Dated this 3rd day of June, 2013.

_____

**MARTHA VAZQUEZ**
**UNITED STATES DISTRICT JUDGE**

*Attorneys for Plaintiff:*
Cindy Rhodes Victor
Kevin Hammar

*Attorney for Defendant:*
William L. Lutz
David P. Lutz